**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JAMIE FOSTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Cause No. |
| v. ) | |
| ) | JURY TRIAL DEMANDED |
| VILLAGE OF GLEN CARBON, ILLINOIS, ) | |
| ) | |
| Defendants. ) | |

**COMPLAINT**

NOW COMES Plaintiff, by her attorneys, and for her complaint against the Village of Glen Carbon, Illinois (hereinafter "Defendant" or "the Village"), an Illinois Municipality, states as follows:

### INTRODUCTION

1. This matter arises under the Americans with Disabilities Act as amended, 42 U.S.C. § 12111, *et. seq.* and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*. Plaintiff was employed as an animal control officer by the Village of Glen Carbon, IL. During Plaintiff's employment, she was subjected to harassment and discrimination by the Village of Glen Carbon based on Plaintiff's age and disability. The Village of Glen Carbon retaliated against Plaintiff and terminated her in retaliation for complaining about and opposing the discriminatory conduct.

### JURISDICTION AND VENUE

2. Plaintiff invokes this Court's jurisdiction under 28 U.S.C. § 1331, 1343(a), and 42 U.S.C. § 2000e-5 to hear and decide claims under federal law. Plaintiff invokes supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) to hear and decide Plaintiff's claims under Illinois state law.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and 42 U.S.C. § 2000e-5(f)(1)(B)(3) because all events giving rise to this action occurred within the Southern District of Illinois.

4. On May 14, 2019, Plaintiff cross-filed a charge against Defendant with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR") alleging disability discrimination, age discrimination, and retaliation. On August 16, 2019, Plaintiff filed an amended charge on alleging disability discrimination, age discrimination, and added an additional act of retaliation. On February 6, 2020, The EEOC sent Plaintiff a Right to Sue letter. Plaintiff received the letter on or about February 18, 2020. This action is filed within 90 days of receipt of the foregoing notice. Plaintiff has complied fully with the administrative exhaustion requirements of the ADA and the ADEA.

## PARTIES

5. Plaintiff Jamie Foster is a 65-year-old person who resides in Glen Carbon, Illinois. Her date of birth is August 21, 1954.

6. Plaintiff has a hearing disability. Plaintiff manages her hearing disability by wearing hearing aids. As explained more fully below, her diagnosis did not impact her ability to perform the essential functions and duties of her job.

7. Defendant Village of Glen Carbon, Illinois, is an Illinois municipal corporation that has the capacity to sue and be sued. Its main offices are located at 151 N. Main Street, Glen Carbon, IL 62034.

## STATEMENT OF FACTS COMMON TO ALL COUNTS

8. Plaintiff began working for the Village of Glen Carbon in 2000 as Animal and Ordinance Enforcement.

9. Plaintiff worked for the Police Department for the first 17 years of her employment.

10. In the Police Department, Plaintiff handled animal control calls, which involved trapping wild animals or stray animals in the Village. Plaintiff also wrote citations for various ordinance violations, including illegal fires, and removal of high weeds.

11. In 2017, Plaintiff transferred to the Building and Zoning Department.

12. Plaintiff's duties remained the same, with the addition of overseeing maintenance and housing construction ordinances.

13. By the end of Plaintiff's employment, Plaintiff earned approximately $21.63 per hour.

14. Plaintiff worked for the Village for 18 years without incident or discipline.

15. In November 2018, Plaintiff's supervisor, Mr. David Coody, resigned.

**I.    Colleen Schaller**

16. A few weeks after Mr. Coody resigned, Police Chief Todd Link assigned Colleen Schaller to act as interim supervisor in the Building and Zoning Department until the Village hired a Building and Zoning Administrator.

17. Ms. Schaller is around thirty years old.

18. Ms. Schaller worked in the Police Department. While Ms. Schaller was Plaintiff's supervisor, Plaintiff temporarily transferred departments to the Police Department again.

19. Ms. Schaller, who was more than thirty years younger than Plaintiff, referred to Plaintiff as "granny."

20. Several police officers under Ms. Schaller's supervision also called Plaintiff "granny" in Ms. Schaller's presence. Ms. Schaller never stopped them or said anything about it.

21. It was also generally known among Plaintiff's coworkers that Plaintiff had a hearing disability and wore hearing aids.

22. Several of the police officers also made derogatory comments regarding Plaintiff's hearing aids such as, "Turn your hearing aids up, granny!" Ms. Schaller never stopped them or said anything about it.

23. Once during Plaintiff's employment, a neighboring city police chief visited the Police Department. When Plaintiff walked by, she observed Chief Link make gestures to the city police chief pointing at his ears to signal Plaintiff had a hearing disability.

24. At about the same time Ms. Schaller became Plaintiff's supervisor, several major changes occurred within the Village.

25. Ms. Schaller began sending employees to the new municipal court to handle tickets for ordinance violations. Before, Plaintiff went to Madison County's traffic court to handle tickets.

26. Ms. Schaller also required Plaintiff to use the Village's new, online ticket and ordinance management programs.

27. In addition to these new changes, Ms. Schaller did not tell Plaintiff how her standards and expectations differed from Mr. Coody's.

28. For example, part of Plaintiff's job was to notify residents of the Village when their lawns did not comply with local ordinances.

29. Sometimes when Plaintiff notified residents via mail that they must cut their lawn or pay the city to do so, the letters come back undeliverable.

30. Under Mr. Coody's supervision, if a letter came back undeliverable, Mr. Coody directed Plaintiff to proceed to the next step and schedule the lawn to be cut.

31. About two weeks after Ms. Schaller became Plaintiff's supervisor, a letter came back undeliverable regarding a lawn ordinance violation. Plaintiff scheduled the lawn to be cut.

32. Ms. Schaller wrote Plaintiff up for scheduling the lawn to be cut.

33. Plaintiff explained that the situation was common and apologized for any error on her part. Ms. Schaller did not listen and wrote Plaintiff up anyway.

34. On November 21, 2018, Ms. Schaller called Plaintiff into a meeting with Chief Link and Glen Neal, the union steward. Ms. Schaller told Plaintiff she needed to be disciplined for scheduling the lawn to be cut.

35. Plaintiff notified Chief Link she wanted to file a grievance through her union for the write-up. Chief Link talked Plaintiff out of it and told Plaintiff the write up was only because the Village "wanted her to do her job better."

36. Plaintiff never witnessed Chief Link or Ms. Schaller discipline non-disabled, younger employees or write them up. Instead, they allowed variance in ordinance enforcement by non-disabled, younger employees.

37. It was common for Village employees to exercise discretion in deciding when to issue an ordinance or how they enforced an ordinance.

**II.     Stacey Jose**

38. In February of 2019, the Village hired Ms. Stacey Jose as the new Building and Zoning Administrator.

39. Ms. Jose became Plaintiff's supervisor and Plaintiff moved back to the Building and Zoning Department.

40. Ms. Schaller continued to work for the Police Department.

41. Ms. Jose is approximately 40 years old.

42. In early March 2019, Plaintiff responded to an animal control call reporting 15 small dogs living in a garage. Officer David Zarr and a student doing a ride-along were also present.

43. When Plaintiff arrived at the residence, Plaintiff spoke with the owner. The owner told Plaintiff she was breeding Chihuahuas.

44. Plaintiff explained applicable ordinances and the 3-animal limit per household ordinance to the owner.

45. Plaintiff told the owner she was in violation of the ordinances.

46. Out of concerns for the animals' health, Plaintiff told the owner she likely needed to obtain a breeder's license because there were more than five female dogs in the home and they were being kept in a garage.

47. Later that day, Plaintiff researched breeding licenses and how they related to the city ordinances. Plaintiff printed off her research and added it to the file.

48. Plaintiff went to Ms. Jose to ask her some clarifying questions about the breeding licenses.

49. Ms. Jose barely listened to Plaintiff's questions, took the file from Plaintiff, and told her she did not have the time to talk to her. Ms. Jose directed Plaintiff to stop working on the file.

50. Sometime in early March 2019, Ms. Schaller expressed open frustration in court with Plaintiff when she could not hear Ms. Schaller whispering to her.

51. In court, several people, including Ms. Schaller, attempted to talk to Plaintiff at once. The Village attorney approached Plaintiff to talk with her. At the exact same time, Plaintiff received a call through her hearing aid's Bluetooth speaker from her daughter. All the while, Mr.

Neal also tried to whisper something in Plaintiff's ear. Plaintiff had a difficult time differentiating the various noises and asked each person to talk one at a time.

52. Plaintiff had no reason to believe she was in trouble for what happened at the courthouse that day or for asking her coworkers to speak one at a time. Despite her frustration, Ms. Schaller did not tell Plaintiff she did anything wrong. Likewise, Ms. Jose was present and did not say or do anything to Plaintiff.

53. A week later, on or about March 7, 2019, Ms. Jose told Plaintiff that she needed to meet with her.

54. When Plaintiff arrived at the meeting, Ms. Jose and Lori Gibson, from human resources, were present. Plaintiff asked for her union steward to be present. Ms. Jose denied the request and told Plaintiff she did not need one.

55. Ms. Jose assigned Plaintiff a performance improvement plan ("PIP") and accused Plaintiff of trying to help the Chihuahua breeder obtain a license. Ms. Jose told Plaintiff she should have written up the Chihuahua breeder that day.

56. There had never been a requirement that Plaintiff issue a citation on the spot. In the past, Plaintiff always issued warnings and gave citizens time to correct the violations. It had never been an issue.

57. Part of the PIP directed Plaintiff to "relinquish all duties related to animal control." The PIP stripped Plaintiff of half of her job duties. The PIP also took away Plaintiff's work vehicle.

58. One 'area of improvement' listed on the PIP stated, "Must wear hearing aids while working at all times."

59. If not met, the PIP stated, "1st infraction, she will be sent home to retrieve them. She will be written up for being tardy. Continued infractions will result in further disciplinary action."

60. Plaintiff asked Ms. Jose why the PIP mentioned her hearing aids.

61. Ms. Jose told Plaintiff it was because she could not hear in court.

62. Plaintiff told Ms. Jose she always wore her hearing aids to work.

63. Further, there had never been a work-related incident where Plaintiff did not wear her hearing aids or failed to do her job because of her hearing disability.

64. At the end of March 2019, Plaintiff met with James Bowden, the Village Administrator, to discuss her discipline further. During Plaintiff's meeting with Mr. Bowden, he encouraged Plaintiff to sign a severance agreement and resign. Mr. Bowden told Plaintiff is she signed, it would "all go away." Plaintiff declined and the discipline stayed in her file.

### III. Retaliation

65. Plaintiff raised concerns regarding disability and age discrimination after receiving the PIP. Sometime around March 7, 2019, Plaintiff met with Ms. Jose and Mr. Neal, Plaintiff's union steward.

66. Plaintiff stated the discipline and PIP were unfair. Plaintiff told Ms. Jose and Mr. Neal, "I don't know if it's my age or my hearing loss, but I think the discipline is discrimination." Ms. Jose responded by saying, "Obviously, you don't know me."

67. Neither the Village nor Ms. Jose took further steps to investigate Plaintiff's discrimination concerns.

68. Just a few weeks after Plaintiff voiced her concerns about discrimination, Ms. Jose retaliated and disciplined Plaintiff for a small error she made a few weeks prior.

69. The error was including two of three ordinances in a letter to a homeowner. In the letter, Plaintiff told the homeowner that the junk in their yard needed to be removed but did not cite the specific junk-removal ordinance.

70. Ms. Jose issued Plaintiff another write-up for this incident.

71. On May 14, 2019, Plaintiff filed a charge with the EEOC alleging age discrimination and disability discrimination.

72. On June 11, 2019 Ms. Jose emailed Plaintiff and told her they needed to meet to discuss two properties in Glen Carbon: 33 Jennifer Drive and 11 Shingle Oaks Drive.

73. By way of background, the 33 Jennifer property was an uninhabited property that had various ordinance violations including overgrown scrub trees, a rotten fence, and mildewed siding. Plaintiff noted the violations in 2015 or 2016 but could not locate the property owner until 2017 because the property owner was in Sweden.

74. Once Plaintiff successfully contacted the owner sometime in 2017, Plaintiff told the owner there were three ordinance violations that needed to be resolved: 1) remove, replace, or repair her rotten wooden fence; 2) cut down and remove scrub trees that blocked the entrance to the door and threatened the house's foundation, and 3) remove mildew on the siding of the home.

75. The owner cooperated. She removed the fence and cleared out the trees. She also told Plaintiff she would hire someone to clean up the siding so the house could sell.

76. Plaintiff closed the file.

77. The 11 Shingle Oaks property lacked siding on the back side of the house. The 11 Shingle Oaks home also had a shed encroaching on another property. The 11 Shingle Oaks property violations began sometime in 2016.

78. Plaintiff's previous supervisor, Mr. Coody, instructed Plaintiff to write all the citations for the department on behalf of the department, because the other employees had messy handwriting. As a result, Plaintiff wrote the citation for the 11 Shingle Oaks home.

79. The 11 Shingle Oaks case belonged to another Building and Zoning employee at that time. When the Village opened the 11 Shingle Oaks property case, Plaintiff did not handle housing maintenance ordinances yet.

80. On June 12, 2019, Plaintiff and Ms. Jose met around 3:00 PM. Ms. Gibson, with human resources, and Mr. Neal, from the union, were also present.

81. During the meeting, Ms. Jose asked Plaintiff why she did not issue a citation to the owner of 33 Jennifer for the mildew. Plaintiff explained to Ms. Jose that the owner of 33 Jennifer had not lived at the residence since 2014. It took Plaintiff several years to find the owner because the owner lived in Sweden. Plaintiff told Ms. Jose she could not e-mail the owner a citation, and the owner completed 2 of the 3 violations and told Plaintiff she would have the siding cleaned to sell the home.

82. Further, the 33 Jennifer neighborhood also had multiple homes with mildewed siding. Plaintiff planned to reach out to the homeowner's association to send out a general notice about removing mildew from homes in the neighborhood. Where there was a widespread deficiency, it was department policy not to single out just one of the properties. Contacting the homeowner's association would allow Plaintiff to address the widespread deficiency.

83. Ms. Jose said she should not have closed the case and instead should have issued a citation for the mildewed siding.

84. Ms. Jose then told Plaintiff she did not properly issue the citation for the 11 Shingle Oaks property or follow up with the case.

85. Regarding 11 Shingle Oaks, Plaintiff told Ms. Jose multiple times that 11 Shingle Oaks was not Plaintiff's case. Plaintiff explained she simply wrote the citation on behalf of another employee by the direction of Mr. Coody.

86. No supervisor, including Mr. Coody, ever notified Plaintiff that 11 Shingle Oaks was her case.

87. At the June 12, 2019 meeting, just less than a month after Plaintiff filed her charge of discrimination, Ms. Jose placed Plaintiff on administrative leave pending termination.

88. Ms. Jose told Plaintiff her suspension was due to her "lack of action" on the 33 Jennifer and 11 Shingle Oaks cases.

89. Plaintiff told Ms. Jose that her union contract stated she must be reprimanded for any infraction within 5 days of the infraction. The alleged infractions with 33 Jennifer and 11 Shingle Oaks occurred months ago.

90. Plaintiff also told Ms. Jose she was being singled out because of her age and disability. Plaintiff told Ms. Jose that other employees are not punished for similar infractions.

91. In response, Ms. Jose told Plaintiff she needed to turn in her keys, passwords, key card, iPad, phone, and I.D. card.

92. Ms. Jose called the police and an officer came to escort Plaintiff off the premises.

93. Plaintiff was humiliated and embarrassed.

94. On June 20, 2019, Plaintiff met with her union representatives, Mr. Neal and Mr. Chism, as well as Mr. Bowden, Ms. Jose, and Ms. Gibson.

95. Mr. Bowden asked Plaintiff if she had "anything relevant" to add to the reports of #33 Jennifer or #11 Shingle Oaks Drive.

96. Plaintiff told Mr. Bowden #11 Shingle Oaks was not her case, just like she previously told Ms. Jose. Mr. Bowden, Ms. Jose, and Ms. Gibson were not interested in listening to Plaintiff's explanations.

97. Mr. Bowden held an envelope and nervously flipped it back and forth while Plaintiff spoke. Mr. Bowden muttered that a determination had already been made.

98. Mr. Chism asked Mr. Bowden why he was questioning Plaintiff if he had already decided. Mr. Bowden did not answer Mr. Chism.

99. Before Plaintiff had any opportunity to defend herself further, Mr. Bowden handed Plaintiff a termination letter dated June 19, 2019.

## VIOLATIONS OF LAW

### COUNT I:
### The Americans With Disabilities Act - Discrimination

100. Plaintiff incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

101. Plaintiff was qualified for her job and completed her job duties in a competent and timely manner.

102. Plaintiff is a person with a disability within the meaning of 42 U.S.C. § 12102(1).

103. Defendant is an employer within the meaning of 42 U.S.C. § 12111(5)(A).

104. As described above, Defendant engaged in disability discrimination in the terms and conditions of Plaintiff's employment, in violation of 42 U.S.C. § 12112.

105. Plaintiff's supervisor considered Plaintiff's disability when administering discipline. Such bias is in violation of 42 U.S.C. § 12112.

106. The misconduct described in this Count severely limited Plaintiff's opportunities and status on the basis of her disability, in violation of 42 U.S.C. § 12112.

107. As a direct result of Defendant's conduct, Plaintiff suffered and will continue to suffer lost wages and other economic benefits of employment, as well as emotional distress.

108. As a direct result of Defendant's conduct, Plaintiff has incurred and will continue to incur attorney's fees, costs and other expenses in connection with this matter.

## COUNT II:
## The Americans With Disabilities Act – Retaliation

109. Plaintiff incorporates by reference the allegations in the foregoing paragraphs as if fully set forth herein.

110. Plaintiff was qualified for her job and completed her job duties in a competent and timely manner.

111. Plaintiff is a person with a disability within the meaning of 42 U.S.C. § 12102(1).

112. Defendant is an employer within the meaning of 42 U.S.C. § 12111(5)(A).

113. Defendant terminated Plaintiff from her position in retaliation for reporting disability discrimination by its employees, opposing discriminatory conduct, and for filing a charge with the EEOC, in violation of 42 U.S.C. § 12203.

114. As a direct result of Defendant's conduct, Plaintiff suffered and will continue to suffer lost wages and other economic benefits of employment, as well as emotional distress.

115. As a direct result of Defendant's conduct, Plaintiff has incurred and will continue to incur attorney's fees, costs and other expenses in connection with this matter.

## COUNT III:
## Age Discrimination in Employment Act - Discrimination

116. Plaintiff hereby incorporates as if set out fully herein all previous paragraphs of this Complaint.

117. Plaintiff was qualified for her job and completed her job duties in a competent and timely manner.

118. Plaintiff is an employee within the meaning of 29 U.S.C. § 630(f).

119. Defendant is an employer within the meaning of 29 U.S.C. § 630(b).

120. As described above, Defendant discriminated against Plaintiff because of her age, in violation of 29 U.S.C. § 623(a)(1), which makes it unlawful to discriminate against any individual with respect to the compensation, terms, conditions, or privileges of employment because of her age.

121. Defendant's conduct was intentional, malicious and in reckless indifference to Plaintiff's federally protected rights. Plaintiff is entitled to an award of liquidated damages.

122. As a direct result of Defendant's conduct, Plaintiff suffered and will continue to suffer lost wages and other economic benefits of employment, as well as emotional distress.

123. As a direct result of Defendant's conduct, Plaintiff has incurred and will continue to incur attorney's fees, costs and other expenses in connection with this matter.

## COUNT IV:
## Age Discrimination in Employment Act - Retaliation

124. Plaintiff hereby incorporates as if set out fully herein all previous paragraphs of this Complaint.

125. Plaintiff was qualified for her job and completed her job duties in a competent and timely manner.

126. Plaintiff is an employee within the meaning of 29 U.S.C. § 630(f).

127. Defendant is an employer within the meaning of 29 U.S.C. § 630(b).

128. Defendant retaliated against Plaintiff for reporting age discrimination by its employees, opposing discriminatory conduct, and for filing a charge with the EEOC, in violation of 29 U.S.C. § 623(d).

129. Defendant's conduct was intentional, malicious and in reckless indifference to Plaintiff's federally protected rights. Plaintiff is entitled to an award of liquidated damages.

130. As a direct result of Defendant's conduct, Plaintiff suffered and will continue to suffer lost wages and other economic benefits of employment, as well as emotional distress.

131. As a direct result of Defendant's conduct, Plaintiff has incurred and will continue to incur attorney's fees, costs and other expenses in connection with this matter.

### REQUEST FOR RELIEF

132. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant Village of Glen Carbon, IL, awarding lost wages and benefits, reinstatement, front wages, emotional distress damages, compensatory damages, pre- and post-judgment interest, and attorney's fees and costs, as well as any other relief this Court deems may be just and proper.

### JURY DEMAND

133. Plaintiff hereby demands a trial by jury on all issues triable by jury.

Respectfully submitted by: /s/ Sarah Jane Hunt
Thomas E. Kennedy
Sarah Jane Hunt
MaryAnne Quill
KENNEDY HUNT, P.C.
906 Olive St., Ste. 200
St. Louis, MO, 63101
314-872-9041 - telephone
314-872-9043 – facsimile
tkennedy@kennedyhuntlaw.com
sarahjane@kennedyhuntlaw.com
mquill@kennedyhuntlaw.com

*Attorneys for Plaintiff*