IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JAMIE FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 20-cv-00417-JPG |
| | ) | |
| VILLAGE OF GLEN CARBON, IL. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

## I. INTRODUCTION

Before the Court is Defendant the Village of Glen Carbon ("Village" or "Defendant") (Doc. 31) Motion for Summary regarding Plaintiff Jamie Foster ("Plaintiff or "Ms. Foster") allegations of age and disability discrimination and retaliation under the Americans with Disabilities Act as amended, 42 U.S.C. 12111 ("ADA"), the Age Discrimination in Employment Act ("ADEA"), and the Illinois Human Rights Act. Foster is currently sixty-seven years old (sixty-five at the time of her termination in 2019) and has a hearing disability, which requires her to wear hearing aids.

Ms. Foster contends that the Village, a municipal division located in Glen Carbon, Illinois, discriminated against her (and ultimately retaliated against her) as a result of her age and hearing disability. This Order addresses Defendant's Motion for Summary Judgment (Doc. 31).

## II. FACTUAL BACKGROUND

Defendant's motion for summary judgment contained 83 uncontroverted facts (Doc 32, Exhibit 1). In response, Plaintiff responded to Defendant's statement of uncontroverted facts and submitted an additional 210 material facts (Doc. 41).

Ms. Foster worked in the Village of Glen Carbon since 1999, where she initially worked

as a dispatcher in the Village's Police Department. A year later she became a Public Service Officer. In 2016 Ms. Foster was transferred to the police department and her job title changed to "Ordinance Enforcement" where she handled ordinance violations and enforcement in the Village. (Doc. 32, p. 2). Ms. Foster was transferred to the Building and Zoning Department in 2017. Compl ¶ 11.

Ms. Foster had numerous supervisors from 2015 to her ultimate termination from the Village in 2019. From May 2016 - November 2017 Coleen Schaller supervised Ms. Foster. Chief Todd Link ("Chief Link"), a Police Chief at the Village, was Ms. Foster's supervisor from 2015-2017 and again from October 2018 – February 2019. (Doc. 32, at p. 2). David Coody was Ms. Foster's supervisor from November 2017 – October 2018. *Id*. at 4. Stacy Jose, the Building and Zone Administrator in the Village was Ms. Foster's supervisor from February 2019 until Ms. Foster was terminated in June 2019. *Id*.

Prior to November 2018, Village employees called Ms. Foster "granny" and made fun of her hearing aids (Doc 41, p. 31). Ms. Foster recalls officers on several occasions commenting and teasing Ms. Foster for her hearing disability. *Id*. Notably, Ms. Foster's supervisor Ms. Schaller teased Ms. Foster regarding her age and hearing disability, calling her "granny." *Id*.

<u>September 2016 Incident</u>

Around 2015, with many changes occurring at the Village, Ms. Foster began having issues with her supervisors, resulting in a number of written and oral reprimands from Ms. Foster's supervisors. On September 23, 2016, Ms. Foster signed a memo, authored by her then-supervisor Ms. Schaller, indicating Ms. Foster "had not appropriately applied a Glen Carbon Village Ordinance regarding the towing of Abandoned, Hazardous Vehicles[.]" (Doc. 32, Exhibit B). The "intention of this memo is to document these orders as they were given and confirm you

understand and intend to follow them, as well as comply with proper enforcement of all village ordinances, moving forward." *Id.* Ms. Foster and Ms. Schaller signed the memorandum. *Id*. Ms. Foster denies that this document was a disciplinary action against her. (Doc. 41, p. 12-13).

November 2018 Incident - Fillmore

On or about November 2018, Ms. Foster oversaw abating a property in violation of the overgrown grass ordinance. Ms. Foster made a "typographical" mistake and sent a mowing bill to North Fillmore instead of South Fillmore. (Doc. 41, p. 15). This error cost the Village around $75.00. *Id*. She did not notice the mistake when the mowing bill came back undelivered. *Id*. Ms. Foster received a written reprimand from Chief Link on November 21, 2019 for not discovering the mistake. Ms. Foster stated she did not sign written discipline from her then-supervisor Chief Link because she followed the same procedure "since the date she was hired" by sending people to cut the grass even when she had not been able to contact the owner of the property. *Id.* Chief Link stated in the reprimand that, "[e]very time you cite the wrong property owner for an offense not committed, or fail to cite an offender property owner…you…cause…convoluted confusion in the enforcement of our Village ordinances." (Doc. 32, Exhibit D). Ms. Foster did not sign this written reprimand. *Id*.

March 2019 Incident – 3 Foreman

On March 7, 2019, Ms. Jose issued a written reprimand and one-day suspension to Ms. Foster relating to an issue to a property at 3 Foreman. (Doc 41, p. 17-18). When Ms. Foster inspected the home at 3 Foreman, she discovered there were fifteen dogs residing in the home, a violation of a Village ordinance. Ms. Foster stated it was customary for the ordinance officer to conduct research and later get in touch with the property owner before issuing a written citation, which Ms. Foster did here. (Doc 41, p. 17-18). Ms. Jose referred Ms. Foster to written discipline

and a one-day suspension (Doc. 42, Exhibit 9). Ms. Foster refused to sign this Referral for Suspension because she felt she did nothing wrong. *Id*. On this day, Ms. Jose gave Ms. Foster a "Performance Improvement Plan." During the improvement plan meeting, Ms. Jose mentioned Ms. Foster's hearing aids. (Doc. 41, p. 19-20).

<u>April 2019 Incident – 3 Tealbrook</u>

In April 2019, Ms. Foster received an additional written reprimand by Ms. Jose for a failure to include junk on the property in a written notice to the property owner of 3 Tealbook (Doc. 32, Exhibit M). Because of Ms. Foster's failure to include junk in the notice, Ms. Jose subsequently dismissed the two citations since the Village did not adhere to the property owner's due process rules. *Id*. Ms. Foster, however, believed the proper procedure was to allow time for property owner to rectify the ordinance violation before issuing a written violation. (Doc. 41, p. 21). As such, Ms. Foster did not sign this written reprimand. *Id*.

<u>130 Edwards</u>

Ms. Foster issued a notice of violation to the property owner at 130 Edwards, with a compliance deadline that the property owner remove trash from the property by March 20, 2019. When Ms. Foster went by the property on April 24, 2019, the trash was partially cleaned up. (Doc. 41, p. 23). Ms. Foster stated the property owner's son indicated he would clean it up and thus did not issue the violation notice. *Id*. However, the Village submitted no written discipline or write-up because of this incident.

<u>33 Jennifer & 11 Shingle Oaks</u>

Regarding the property on 33 Jennifer, Ms. Foster had given notice to the homeowner regarding three violations, with a March 15, 2019 deadline, to remedy the violations. Ms. Foster stated the homeowner (who lived out of the country) resolved two of the violations but not the

third violation regarding mildewed siding, which Ms. Foster stated many other homeowners in the subdivision contained. (Doc. 41, p. 24). Ms. Foster stated she closed the file with the intention of requesting the Homeowner's Association place a notice in their newsletter to the other homeowners. *Id*. Ms. Jose took away the file before Ms. Foster had a chance to remedy the file. *Id*. Mr. Bowden cited Ms. Foster's handling of this property as a reason for her termination. (Doc 32, Exhibit F).

Finally, Ms. Foster was reprimanded for not being prepared to testify regarding ordinance violations at the property on 11 Shingle Oaks municipal docket. Ms. Foster stated this property was not assigned to her and stated so in multiple emails. Mr. Bowden cited Ms. Foster's handling of this property as a reason for her termination. (Doc 32, Exhibit F).

Termination

On May 14, 2021, Ms. Foster filed a charge against the Village with the EEOC. The EEOC charge was emailed to Lori Gibson, Human Resources at the Village, on May 15, 2019.

On June 19, 2019 Jamie Bowden, Village Administrator, sent a letter to Ms. Foster setting the basis for Ms. Foster's termination (Doc 32, Exhibit F). This letter identified Ms. Foster's deficient performance regarding enforcement of ordinance violations at 33 Jennifer Dr., 11 Shingle Oaks Dr., and 130 Edwards as reasons for her termination. *Id*. Additionally, the letter stated that Ms. Foster was being terminated for a refusal to accept responsibility for her errors over the past few years. *Id*. Ms. Foster stated that on June 19, 2019, Mr. Bowden was supposed to have a grievance meeting with Ms. Foster but instead, he terminated her, in violation of the grievance procedure. (Doc. 41, p. 27).

## III. LAW AND ANALYSIS

Summary judgment must be granted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Spath v. Hayes Wheels Int'l–Ind., Inc*., 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

**A. <u>ADA, ADEA, and Illinois Human Rights Act Discrimination Claims</u>**

This Court first addresses Ms. Foster's federal disability discrimination claim, age discrimination claim, and disability discrimination claim under the Illinois Human Rights Act ("IHRA").

To succeed on an ADA claim, an employee must show three elements: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) his disability caused the adverse employment action. Americans with Disabilities Act of 1990 § 102, 42 U.S.C. § 12112(b)(5)(A). Ms. Foster meets the first two elements. The ADEA prohibits an employer from discriminating against an individual on the basis of age. *Aberman v. Bd. of Educ. of City of Chicago*, 242 F. Supp. 3d 672, 686 (N.D. Ill. 2017); 29 U.S.C. § 623(a). Age Discrimination claims under IRHA are analyzed the same way as ADEA claims. *Teruggi v. CIT Grp./Cap. Fin., Inc*., 709 F.3d 654, 659 (7th Cir. 2013).

To survive summary judgment on his claims under the ADA, ADEA, and IHRA, a plaintiff must offer evidence from which an inference of discriminatory intent can be drawn, such as: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees

outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action. A party may combine these various types of evidence to present a 'convincing mosaic' of circumstantial evidence from which a factfinder can make a reasonable inference of discriminatory intent. *Teruggi v. CIT Grp./Cap. Fin., Inc*., 709 F.3d 654, 659–60 (7th Cir. 2013) (cleaned up). Whether a plaintiff offers direct or circumstantial evidence of discrimination, the Seventh Circuit has made clear in *Ortiz v. Werner Enters., Inc*. that "all evidence belongs in a single pile and must be evaluated as a whole." 834 F.3d 760, 766 (7th Cir. 2016).

To present this evidence, a plaintiff may utilize the McDonnell Douglas "burden-shifting framework." *McDaniel v. Progress Rail Locomotive, Inc*., 940 F.3d 360, 367–68 (7th Cir. 2019) (internal citations omitted). Here, a plaintiff must show (1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably. *Id*. "If the plaintiff meets each element of her *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id*. Here, the parties dispute as to elements (2) and (4), whether Ms. Foster was meeting Defendant's legitimate expectations and whether similarly situated employees who were not members of her protected class were treated more favorably, respectively.

Turning to the second element, it is clear that Ms. Foster was not meeting the Village's expectations. Ms. Foster rebuts the number of written reprimands, notably the Fillmore and 3 Tealmore properties, by stating she was following proper procedure as she had always done in

her decades of experience. Additionally, Ms. Foster states she was a "legacy employee" and worked with the Village without written reprimand for eighteen years. However, "the issue is not the employee's past performance but 'whether the employee was performing well at the time of [his] termination.'" *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) (quoting *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991)). While Ms. Foster could have been a model employee before 2015, she was not meeting the Village or her supervisor's expectations from 2015 until her termination. This is evidenced by the reprimands she received stating she was underperforming and not meeting expectations. Ms. Foster does not claim she was satisfactorily meeting expectations of the Village after the Chief Links arrived in 2015. The Court finds Ms. Foster was underperforming to the standards of her supervisors *at the time of her termination*.

Ms. Foster argues that there were no written expectations, job description, or training. Ms. Foster cites no authority for her position that the Village was required write down expectations and job descriptions, and the Court is unaware of any. *Also see Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir.2008) (recognizing that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform"). Even if, as Ms. Foster claims, the October 31, 2018 mass email was not an email providing a meaningful description of job duties, her supervisors outlined what her expectations were in subsequent written reprimands. Specifically, her supervisors cite concerns that she was not issuing and properly enforcing Village ordinances detailing what Ms. Foster did incorrectly. (Doc. 32, Exhibit B) ("I determined you had not appropriately applied a Glen Carbon Village regarding the towing of Abandoned, Hazardous Vehicles (Chapter 7), and the Special Assessment (Chapter 8)"); (Doc. 32, Exhibit D) ("your mistakes included your failure to make any reasonable and concerted effort to determine

the *actual* owner of the property abated, your failure to address notice letters properly, and your failure to show up in a competent manner once the notice correspondence had been returns to you marked 'No Such Address.'"); (Doc. 42, Exhibit 9 ) ("[Ms. Foster] spent more of the Village's time and resources in an effort to assist the alleged offender, create and [sic] after the fact justification for the number of dogs at the residence in a clear contravention of the Village's Ordinance [Pets Ordinance 10-14-11] than performing her assigned duties, up to and including, investigating the complaint to determine if further actions were necessary on the Village's behalf); (Doc. 32, Exhibit M) ("[f]ollowing Village of Glen Carbon Adjudicatory procedure and the enforcement of Village Ordinances, and prior to the issuance of Citations, residents must be notified in writing, via approved Notices of Violation, of the specific ordinances of which are in violation"); (Doc. 32, Exhibit F) ("[f]ollowing the April 2019 final warning, you failed to address the code violations at 130 Edwards, 33 Jennifer and 11 Shingle Oaks in an acceptable manner" and "repeatedly failed to even acknowledge your performance deficiencies and, instead, seek to blame others").

Additionally, Ms. Foster did not sign the writeups pertaining to Fillmore and 3 Tealmore because she believed that giving the property owner time to remedy the situation was "customary." However, the writeups for failing to issue citations demonstrate a clear directive that Ms. Foster did not follow in subsequent dealings with property owners.

Ms. Foster argues that Defendant treated similarly situated younger and non-disabled employees differently. (Doc. 42, p. 6). The Court disagrees. "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719

(7th Cir. 2021) (internal citations omitted). The purpose of the similarly situated prong is to "eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable – discriminatory animus." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (citation and internal quotation marks omitted). While similarly situated parties need not be "identical in every conceivable way," they "must be directly comparable to the plaintiff in all material respects." *Id*. (internal quotation marks omitted). "When determining whether employees are similarly situated, courts consider whether the employees 1) had the same job description; 2) were subject to the same standards; 3) were subject to the same supervisor; and 4) had comparable experience, education, and other qualifications." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007).

Ms. Foster states Officer Zarr, Officer Jeremy Hosto, and an employee in the Public Works Department[1] are examples of such employees treated differently than her. (Doc. 42, p. 8-10). Officer Zarr and Officer Husto conducted enforcement "in the same manner" as Plaintiff and would exercise discretion in how to handle enforcement. *Id*. at 8. Ms. Foster also states "[s]everal officers also conducted ordinance enforcement in the same manner as Plaintiff and were not scrutinized or disciplined." These officers also were under the supervision of Ms. Schaller, Chief Link, and Mr. Bowden. *Id*. Without more, the Court finds Ms. Foster's description deficient. Even if Officer Zarr and Hosto had the same supervisors as Ms. Foster (although that is unclear from Plaintiff's motion), it is unclear whether these officers had

[1] Ms. Foster relies on a statement the Union Shop Steward shared in a deposition that an unnamed Public Works Department employee caused thousands of dollars in damage to a water line while working for the city and was not disciplined. (Doc. 42, p. 10). Not only is this statement lacking adequate details for a meaningful comparison to Plaintiff, but this statement amounts to a rumor rather than a helpful fact for the Court's analysis.

different job functions as Plaintiff. While Ms. Foster states Officer Zarr and Hosto conducted similar duties to her, it is unclear whether either of those officers were ordinance enforcement officers with the same job title and duties as Ms. Foster. Even if both officers had the same job description and same supervisors, Ms. Foster only states in vague terms that Officer Zarr and Hosto exercised discretion while Ms. Foster was disciplined for doing so. Ms. Foster did not show that they were not disciplined for the type of violations Ms. Foster was cited for such failing to comply with the Hazardous Vehicle Ordinance, Pet Ordinance, Adjudicatory Procedure, abatement error, and others cited above. While this Court does not intend to have these additional details "improperly narrow" the "pool of comparators (*Boumehdi*, at 791)," this Court requires more.

Ms. Foster argues that her position was absorbed by other employees outside her protected class, a mini-reduction-in-force, and requests the Court apply a modified version of the fourth prong. "In a mini-RIF case, where the dismissed employee's duties are absorbed by another employee or employees rather than eliminated, the court applies a modified version of the fourth prong of the prima facie case." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 725 (7th Cir. 2008). "The plaintiff in a single-discharge case does not need to make a showing that similarly situated employees were treated better because the inference of discrimination arises from the fact that they were constructively replaced by workers outside of the protected class." *Bellaver v. Quanex Corp*., 200 F.3d 485, 495 (7th Cir. 2000) (internal quotations omitted). The Seventh Circuit instituted this modification of the fourth prong because of the concern employers "might misuse the RIF description to recharacterize ordinary terminations as reductions in force when they terminate an individual with a unique job." *Id*. However, both Ms. Foster and Defendant do not claim the proffered reason for Ms. Foster's termination was a reduction in

force. Ms. Foster states that this rule should apply "to guard against the danger that the employer can hide a discriminatory motive for terminating the employee by simply stating that the job was eliminated…" (Doc. 42, p. 11). Defendant does state Ms. Foster was terminated because her job was eliminated as a reduction in force. The Court finds that this danger does not exist here and will not apply the modified version of the fourth prong.

Ms. Foster argues the "cat's paw" theory establishes a *prima facie* case for all her claims. (Doc. 42, p. 12). The Court disagrees. "The cat's paw theory of liability is invoked on an ADEA claim when a biased supervisor, or a biased subordinate, who lacks decision-making power, uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." Age Discrimination in Employment Act of 1967 §§ 4, 12, 29 U.S.C.A. §§ 623(d), 631(a); *Sinha v. Bradley Univ*., 995 F.3d 568 (7th Cir. 2021). "To show age-based discrimination on an ADEA claim under the cat's paw theory, the plaintiff must present evidence that the biased subordinate *actually harbored discriminatory animus* against him, and that the *subordinate's scheme proximately caused the adverse employment action*." *Id*. (emphasis added). "Because the cat's paw theory, on a claim of age-based discrimination under the ADEA, requires a showing of both discriminatory animus and proximate causation, court need not address both prongs if the employee makes an insufficient showing on one." *Id*. While the proximate cause analysis requires only "some direct relation," the Court finds that Ms. Foster has been unable to prove that the scheme proximately caused her termination. Thus, even if Ms. Schaller, Chief Link, Ms. Gibson, and Ms. Jose harbored animus towards Ms. Foster, Ms. Foster's claim fails because she is unable to prove their "scheme" proximately caused her termination.

"Employer may avoid cat's-paw liability on a claim under the ADEA if the decisionmaker is not wholly dependent on single source of information and conducts her own

investigation into facts relevant to decision; so long as the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action, the employer will not be liable." *Sinha*, 995 F.3d at 574. Mr. Bowden was the decisionmaker who ultimately terminated Ms. Foster. Mr. Bowden's termination letter lays out the details of his decision to terminate Ms. Foster. Specifically, he cites Ms. Foster's performance issues regarding 33 Jennifer and 11 Shingle Oaks Drive. (Doc 32, Exhibit F). The Court finds Mr. Bowden's letter and analysis did *not* rely solely on a single source of information – namely the testimony of the "biased" supervisors. Mr. Bowden states he reviewed "operative events and documentation contained in the files maintained by the Village" and "considered your [Ms. Foster] explanations provided both at the time of the events when questioned by your immediate supervisor as well as during the meeting that was conducted with you and your shop steward on June 12, 2019." *Id*. Even if Mr. Bowden was not a "paragon of independence (*Sinha,* 995 F.3d at 574)," Mr. Bowden conducted his own investigation into the case files regarding these two properties. The Court finds Mr. Bowden's investigation sufficiently independent and Ms. Foster is unable to provide sufficient evidence regarding "cat paw" employer liability.

Ms. Foster also points to "me too" evidence of Defendant's discriminatory treatment towards older employees. The Supreme Court has held that "me too" evidence can be relevant to a discrimination claim. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008). The relevance of such evidence depends on "a variety of factors" including "how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008), as corrected (Jan. 21, 2009). Ms. Foster points to two older individuals Joe Lancy and Glen Neal whom Ms. Jose targeted for "micromanaging, discipline, and threats of termination." (Doc. 42, p. 17). Mr. Lancy resigned, and Mr. Neal

retired. Without more, Ms. Foster's evidence does not rise to the level of creating an issue of material fact. *Cf Hasan*, 552 F.3d 520 (holding the district court should have analyzed the fact Foley fired or transferred all other Muslim associates from its Business Law Department). The Court considers Ms. Foster's proffered evidence and find, having two people, over the age of 40, leave the Village is insufficient to support an inference of discrimination.

Ms. Foster also alleges that she was not correctly given progressive discipline in accordance with union policies. This is a form of discrimination if there is a "refusal to provide an employee access to progressive discipline (here, an informal channel of discipline) available to other workers..." *Morris v. BNSF Ry. Co.*, 969 F.3d 753, 764 (7th Cir. 2020) (internal citations omitted). Ms. Foster does not provide evidence where others were given access to the type of progressive discipline she was denied. The Village gave Ms. Foster numerous write ups, a suspension, and an improvement plan before terminating her. The Court does not find a failure to follow progressive discipline a form of discrimination in Ms. Foster's case.

The Court finds Ms. Foster has not met the *prima facie* case. However, even if Ms. Foster met the *prima facie* case, Defendant has shown a reasonable, non-discriminatory reason exists for the termination. Here, there is a wealth of evidence to show that Ms. Foster was failing to perform the job of ordinance enforcement officer to her supervisor at the time of her termination. Additionally, it is clear that Ms. Foster did not agree with each of the written reprimands and did not sign written reprimands against her. (Doc. 32, Exhibit D); (Doc. 42, Exhibit 9). Failure to take accountability is cited as in Ms. Foster's termination letter. The Village remained consistent in stating that Ms. Foster was underperforming, was not properly issuing citations in accordance with Village ordinances, and did not take accountability for her actions. *Cf Hasan*, 552 F.3d at 529. (finding an issue of fact existed where after Foley located

Mr. Hasan's work evaluations which were mostly positive and changed its tune "maintaining it actually fired Mr. Hasan not because his work was unacceptable but because it only had enough work to keep the best associates in the department occupied").

While the teasing and name-calling may have been hurtful, this Court finds Ms. Foster has failed to establish a genuine issue as to a material fact that would defeat Defendant's motion.

The Court hereby **GRANTS** summary judgment in favor of the Village regarding Ms. Foster's ADA (Count I), ADEA discrimination (Count III), and Illinois Human Rights Act for age discrimination (Count V), and Illinois Human Rights Act (Count VI) claims.

**B. ADA, ADEA, Illinois Human Rights Act Retaliation Claims**

Next, the Court addresses Ms. Foster's retaliation claims under the ADA, ADEA and IHRA.

"As a threshold matter, the plaintiff must show that the defendant was aware of the protected conduct. If [so], a causal connection can then be demonstrated by suspicious timing alone only when the employer's action follows on the close heels of protected expression." *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 578 (7th Cir. 2021) (internal citations omitted).

Ms. Foster filed a complaint with the EEOC and IHRA on May 14, 2021 regarding her age and disability discrimination claims. On May 15, 2019, the EEOC charge was emailed and mailed to Ms. Gibson, head of the Village's Human Resources Department. On June 19, 2019, Defendant terminated Ms. Foster. (Doc. 42, p. 18).

As Ms. Foster also recognizes, "[s]uspicious timing by itself s rarely enough for a reasonable jury to infer retaliatory motive." *Foggey v. City of Chicago*, 851 F. App'x 615, 619 (7th Cir. 2021) (finding three months between complaint and termination insufficient);

*Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven-week interval between complaint and discharge insufficient); *cf Rowlands v. United Parcel Serv.-Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018) (holding that one month was sufficient where plaintiff "also presented evidence of pretext"). Ms. Foster provides evidence of suspicious timing and nothing more. As stated above, the Court does not find Defendant's reasons for termination pretextual.

Ms. Foster argues that this suspicious timing in conjunction with the rest of her case (repeated discipline from Ms. Jose, Ms. Jose taking away her job duties, immediate one-day suspension, not disciplining other officers), demonstrates a causal connection. (Doc. 42, p. 19) The Court disagrees. In *Igasaki*, the district court dismissed a retaliation claim where Igasaki asked the Court to find "causation from layering one inference (a pattern of poor performance reviews) onto another (suspicious timing)," Ms. Foster requests us to do the same. *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 960 (7th Cir. 2021). The Seventh Circuit did not find "mere assertions to defeat summary judgment, especially when his poor performance provided the Department with a nondiscriminatory rationale for his termination" persuasive and neither will the Court regarding Ms. Foster's assertions. *Id.; see also Morgan v. SVT, LLC*, 724 F.3d 990, 998 (7th Cir. 2013) ("Where, as here, there are reasonable, non-suspicious explanations for the timing of Morgan's termination ... we will not deny summary judgment solely on the strength of [suspicious timing].").

The Court hereby **GRANTS** summary judgment in favor of the Village regarding Ms. Foster's ADA Retaliation (Count II), ADEA Retaliation (Count IV), and Retaliation under the Illinois Human Rights Act (Count VII).

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment regarding (Doc.

31) Counts 1-7 are **GRANTED**.

**IT IS SO ORDERED.**
**Dated: November 29, 2021**

**/s/ J. Phil Gilbert**
**J. PHIL GILBERT**
**DISTRICT JUDGE**